## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## KNOXVILLE DIVISION

| | | |
|---|---|---|
| KIMBERLY WILLIAMS-CLABO, Individually, and as Parent and Next of Kin to MIKA WHEELER CLABO, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. |
| CITY OF KNOXVILLE, Tennessee, a governmental entity, PAUL NOEL, Chief of Police, individually, WILLIAM ROMANINI, individually, JOSEPH MATTINA, individually, BRANDON BREWER, individually, TIMOTHY CAMPBELL, individually, and JOHN and JANE DOES 1-5, individually, | ) ) ) ) ) ) ) ) | Jury of Twelve Demanded |
| Defendants. | ) | |

---

## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS AND WRONGFUL DEATH

---

**COMES** KIMBERLY WILLIAMS-CLABO, as Parent and Next of Kin to MIKA WHEELER CLABO, Deceased ("Plaintiff"), by and through her attorney, and files this Complaint against the Defendants, the CITY OF KNOXVILLE, a governmental entity ("the City"); Chief PAUL NOEL, Individually; Officers WILLIAM ROMANINI, Individually; JOSEPH MATTINA, Individually; BRANDON BREWER, Individually; TIMOTHY CAMPBELL, Individually; and JOHN and JANE DOES 1-5, Individually ("Doe Defendants") (collectively, "Defendants").

# TABLE OF CONTENTS

I.  NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.  Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.  Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.  FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.  Mika Clabo's Promising Life . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    B.  A "Scared" Mika Makes to Neyland Drive as E-911 Receives Calls to Help Him. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    C.  Mika Encounters Officer Romanini and Heads Toward the Tennessee River . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    D.  As Mika Struggles to Keep His Head Above Water, Romanini Encourages Him to Swim and Calls for a Rescue Boat. . . . . . . . . . . 11

    E.  As Other Officers Arrive, They Fail to Plan or Make Rescue Efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    F.  Ten Minutes After Mika Fell Into the Water, Officers Warn-Off Would-Be Rescuers and Offer Mika Only Words of Encouragement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    G.  As Mika Grasps for the Riverbank, Officers Make No Effort to Reach Him With Their Hands, Ropes, a Tow-Strap, Flotation Devices, or a Small Boat. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    H.  Mika Goes Under for Good, With the Rescue Boat Still Minutes Away . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    I.  As Mika Struggled and Drowned, Four KPD Officers Watched, Warning Private Rescuers Away and Refusing to Take Any Action to Help Him. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.    WAIVER OF IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

VI.   CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

      COUNT ONE        42 U.S.C. § 1983 – Violation of Substantive Due
                       Process Under the Fourteenth Amendment (Against
                       Officers William Romanini, Joseph Mattina, Brandon
                       Brewer, and Timothy Campbell, All Individually) . . . .  18

      COUNT TWO        42 U.S.C. § 1983 – Failure to Train and Supervise
                       (Against City of Knoxville and Chief Paul Noel) . . . . . .  21

      COUNT THREE      Negligence (Against Officers William Romanini,
                       Joseph Mattina, Brandon Brewer, and Timothy
                       Campbell, All Individually). . . . . . . . . . . . . . . . . . . . . . . .  25

      COUNT FOUR       Negligent or Reckless Infliction of Emotional Distress
                       (Against Officers William Romanini, Joseph Mattina,
                       Brandon Brewer, and Timothy Campbell, All
                       Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

      COUNT FIVE       Loss of Society and Consortium
                       (Plaintiff, Individually, Against all Defendants) . . . . . .  27

VII.  JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

VIII. PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

-iii-

# I. NATURE OF ACTION

1.     When four KPD officers responded to an incident where a man had fallen into the Tennessee River, the City and the officers violated the victim's Fourteenth Amendment substantive due process rights when the officers refused to make a single rescue attempt and inexplicably warned off private rescuers, resulting in the victim's death by drowning.

2.     In the days preceding July 25, 2022, 30-year old Mika Wheeler Clabo ("Mika"), a gifted child, Master Arborist, and recovering person, had lost everything he had worked for two years: his freedom, his new car, his license and other belongings, his self-esteem, perhaps his home, and possibly worst of all, his sobriety. Witnesses recount seeing a bare-foot Mika being put out of a car onto Market Square in Downtown Knoxville, wearing only underwear and a t-shirt. Dozens of witnesses called E-911 to report the incident and solicit help for Mika, who was reportedly "acting erratically" and appeared to be "running from something." Mika made his way on-foot to the intersection of Neyland Drive and Walnut Street, near the City-County Building.

3.     Mika crossed Neyland Drive, ran along the railroad tracks, jumped a fence, entered the parking lot of Calhoun's On the River, a restaurant that sits above the Tennessee River, and fell onto the pavement. He slowly rose up, walked toward the restaurant, turned and spotted a man clad in black shorts and a black shirt, and hurried behind the building. Seconds later, Mika fell headlong over the brushy riverbank and into the murky waters of the Tennessee River, at exactly 10:14 a.m. on July 25, 2022.

-1-

4.     In the water, witnesses saw Mika struggling hard, fighting to keep his head above water, as his feet and neck kept getting entangled and trapped by vines from bushes along the riverbank. By 10:22 a.m., four KPD officers and two EMTs were present on the riverbank, dock, or deck watching Mika fight for his life, grabbing hold of anything he could, pulled by a strong current. Mika yelled out several times, gasping and groaning, desperate for help, as he tried in vain to pull himself up or free himself from the vines that snared him. Yet, for approximately fifteen minutes, other than coaxing Mika on by yelling at him to "swim" or "get out," no one helped him – not the *four KPD officers* who stood chatting on the riverbank, not an EMT who got to the water's edge before Mika's head went underwater for the last time, and not the employees and patrons of Calhoun's On the River, who watched it all and repeatedly urged the officers to save the drowning man . . . or let them do it.

5.     A Calhoun's employee offered up a twenty-foot long tow-strap to throw out to Mika, who was merely a few feet from the riverbank, if that.  The same man offered to get keys to a storage area that held flotation devices or even a small boat. Seeing how close Mika was to the river bank and familiar with the water depth and current, another Calhoun's employee told officers he could reach Mika. These men and others were warned off by the KPD officers against making any effort to help Mika, with one officer repeatedly telling them "he'll drown you too" or words to that effect. They were *waiting* on a rescue boat, the officers replied.

6.     Worse still, the officers fully understood that Mika's mental health appeared to be compromised, that he may not even know where he was, and that it

-2-

would be difficult for anyone to get out of that water from that spot unaided, as the bank was steep and the murky water was filled with tree branches and vines.

7.     All the while, for almost fifteen minutes, as nearly a dozen people watched from outside the restaurant, the four officers variously urged Mika to "swim" or "get out," but did nothing to actually help him get out of the water. They ran off or warned others from helping, but had no meaningful plan to rescue Mika, aside from waiting indefinitely on a rescue boat that hadn't even been launched yet. Obviously, under these conditions, Mika didn't have a lot of time before he would succumb to the current and water. The four officers neglected to throw Mika a rope, a strap, or a flotation device, or otherwise make a serious attempt to help him out of the water.

8.     At 10:27:12, with Officers William Romanini, Joseph Mattina, Brandon Brewer, and Timothy Campbell each looking on from their safe perches a few feet away, Mika's head disappeared underwater for the last time. About two hours later, his lifeless body was found by rescue divers near where he had fallen into the river – at the water's edge, trapped by vines, his head only inches below the surface in 70-degree water approximately five to six feet deep. The Medical Examiner ruled that his death was an accidental drowning.

9.     By this lawsuit, Plaintiff alleges that Officers William Romanini, Joseph Mattina, Brandon Brewer, and Timothy Campbell, acting under color of state law, deprived Mika of his substantive due process rights and were negligent in their reaction and response to the crisis. The City and Chief Noel are liable as well, as they failed to train City officers to properly and safely handle recurring situations such as

this, where officers are dispatched to incidents at which citizens are imperiled in life-threatening emergencies and time is of the essence to prevent the loss of life. Here, four of Knoxville's finest simply stood by and watched a 30-year old helpless victim drown.

10. Plaintiff alleges the following claims:

(a) violation of Mika's substantive due process rights under the Fourteenth Amendments;

(b) the failure of the City, KPD, and Chief Noel to properly train and supervise KPD officers with respect to appropriate procedures for safely rescuing endangered civilians;

(c) negligence;

(d) negligent or reckless infliction of emotional distress; and

(e) loss of consortium

## II. JURISDICTION AND VENUE

11. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's claims arising under the Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

12. This Court has supplemental jurisdiction over any claims brought under Tennessee law pursuant to 28 U.S.C. §1367, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

13. Venue lies in the United States District Court for the Eastern District of Tennessee because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Knox County. 28 U.S.C. § 1391(b)(2).

-4-

### III. PARTIES

#### A.  Plaintiff

14.    Plaintiff, Kimberly Williams-Clabo, individually, and as Parent and Next of Kin to Mika Wheeler Clabo, brings this action against all of the Defendants. During all relevant times, Plaintiff was a citizen and resident of Jefferson County, Tennessee.[1]

#### B.  Defendants

15.    Defendant, the City of Knoxville, Tennessee ("the City"), is a political subdivision of the State of Tennessee, the duly-formed municipal government for, and the political entity that governs Knoxville, Tennessee. The City may be served with process through Mayor Indya Kincannon, 400 Main St., Room 691, Knoxville, TN 37902.

16.    The City possesses the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of training, supervision, control, employment, assignment, and removal of individual members of the KPD,[2] and to assure that said actions, policies, rules, regulations, practices and procedures of the KPD and its employees comply with the laws and constitutions of the United States and the State of Tennessee.

17.    The City, KPD, and Chief of Police Paul Noel are responsible for all

---

[1]Plaintiff brings this action as Mika's parent and next of kin, as authorized by Tenn. Code Ann. §§ 20-5-106 et seq., Tennessee's Wrongful Death Statute, and as a parent seeking damages for loss of her son's consortium and society. Mika was not married, did not have a surviving spouse, and upon information and belief, had no children.

[2]The KPD is an agency or department of the City.

matters relating to the selection, supervision, promotion, training, and discipline of employees, including uniformed and non-uniformed employees.

18.     At all relevant times, Chief Paul Noel ("Chief Noel") was the duly-appointed Chief of Police for the City of Knoxville, responsible for the screening, hiring, firing, training and the supervision of KPD officers. He is, upon information and belief, a citizen and resident of Knox County and may be served with process at Knoxville Police Department, 1650 Huron Street, Knoxville, TN 37917.

19.     Officer William Romanini ("Officer Romanini") was employed by the KPD at all material times. He is sued in his individual capacity and as principal on his official bond. At all relevant times, Officer Romanini was operating under color of law. He is, upon information and belief, a citizen and resident of Knox County and may be served with process at Knoxville Police Department, 1650 Huron Street, Knoxville, TN 37917.

20.     Officer Joseph Mattina ("Officer Mattina") was employed by the KPD at all material times. He is sued in his individual capacity and as principal on his official bond. At all relevant times, Officer Mattina was operating under color of law.  He is, upon information and belief, a citizen and resident of Knox County and may be served with process at Knoxville Police Department, 1650 Huron Street, Knoxville, TN 37917.

-6-

21.    Officer Brandon Brewer ("Officer Brewer") was employed by the KPD at all material times. He is sued in his individual capacity and as principal on his official bond. At all relevant times, Officer Brewer was operating under color of law.  He is, upon information and belief, a citizen and resident of Knox County and may be served with process at Knoxville Police Department, 1650 Huron Street, Knoxville, TN 37917.

22.    Officer Timothy Campbell ("Officer Campbell") was employed by the KPD at all material times. He is sued in his individual capacity and as principal on his official bond. At all relevant times, Officer Campbell was operating under color of law. He is, upon information and belief, a citizen and resident of Knox County and may be served with process at Knoxville Police Department, 1650 Huron Street, Knoxville, TN 37917.

23.    Plaintiff also sues the fictitious Defendants, Does 1-5, as their true identities and/or capacities and/or other facts showing their culpability are presently unknown. These Defendants are sued in their individual capacities as KPD officers and as principals on their official bonds.[3] They include unknown officers who were present at the incident, had a safe opportunity to help him, but recklessly took no action to help him or prevented or warned others from doing so.

24.    Various persons or entities not made Defendants in this lawsuit, including, but not limited to, City or KPD officials, have participated as co-conspirators

_____

[3]Under Rules 4(m) and 15(c) of the Federal Rules of Civil Procedure, Plaintiff will seek leave of this Court to amend her Complaint to set forth the true names and capacities of such Defendants when their identities are ascertained.

with Defendants in the violations asserted herein and have performed acts and made statements in furtherance thereof. Plaintiff reserves the right to name some or all of these persons as Defendants at a later date, as the Federal Rules of Civil Procedure and precedent permit.

## IV.  FACTUAL ALLEGATIONS

### A.  Mika Clabo's Promising Life

25.     Mika Wheeler Clabo ("Mika"), 30 years old, was a gifted child, with an IQ of 143. A trained Master Arborist who loved the outdoors, Mika had once repelled from a helicopter in Rhode Island to remove a downed tree which had caused an electrical grid to fail. Within a year of working for a tree service company, Mika had been promoted to foreman, with a crew of fifteen men. He was quick to volunteer to help others whose lives, livelihood, or home's were endangered.

26.     As a teenager, Mika had become addicted to opioids, turning later to heroin, and was incarcerated on more than one occasion as a result. Eventually, he began the long, hard road to recovery, joining and then excelling in a court-sponsored rehabilitation program. He moved to a half-way house in Knoxville and had gotten a job at Knox Rail Salvage. His employer viewed Mika as a "hard-worker, always early, worked hard and never refused overtime." Before long, Mika had earned weekend passes to leave the half-way house, which he often used to visit his mother and uncle in Jefferson County, frequently helping his ailing uncle with chores.

27.     Eventually, Mika was able to get his driver's license, car insurance, and bought a car. On the weekend of July 15, 2022, Mika drove to Jefferson County to visit

-8-

his family, stayed the night, and returned to Knoxville on Sunday evening, July 17, 2023. That was the last day Mika's mother saw him alive. On July 21, 2022, Plaintiff reported her son to the KPD as missing.

**B.  A "Scared" Mika Makes to Neyland Drive as E-911 Receives Calls to Help Him.**

28.     On the morning of July 25, 2022, Mika had been set out on the street at Market Square in Knoxville, bare-footed and wearing nothing but underwear and a t-shirt.

29.     On-foot, Mika made his way to Calhoun's On the River, a restaurant on Neyland Drive in Knoxville. As he walked, dozens of calls came in to E-911 about a person in underwear and a t-shirt "acting erratically" at Market Square and then, at the corner of Neyland Drive and Walnut Street, near Calhoun's. The callers and witnesses stated the man seemed to be "scared," like he "was trying to get away from something."

30.     After crossing Neyland Drive, Mika ran along the railroad tracks parallel to Calhoun's, toward the river. Witnesses state – and videos recorded by employees and patrons of Calhoun's confirm –  that Mika ran toward Calhoun's, opened a gate that led to the Tennessee River behind the business, and went into the water. One video, recorded by a Calhoun's employee or patron, shows Mika, clad only in black underwear and t-shirt, getting up off the pavement of Calhoun's parking lot directly in front of the restaurant, crossing the lot and slowing making his way to the river behind the restaurant, as a KPD police cruiser pulls up and stops, Mika passing to its front.

-9-

**C.      Mika Encounters Officer Romanini and Heads Toward the Tennessee River.**

31.      That patrol cruiser was operated by Officer William Romanini ("Romanini"), who sat in his car and watched Mika make his way from Neyland Drive to the river. According to Romanini, he located Mika "walking on the railroad tracks next to Calhoun's at 400 Neyland Drive." Mika was in his bare feet, and appeared to be wearing only underwear and a t-shirt, Romanini reported. According to Romanini, Mika "then jumped, over a fence and ran across the Calhoun's parking lot." Eventually, Romanini approached Mika and asked, "what going on over here?" Mika walked away slowly, and Romanini says, "hey, whatcha doin?"[4]

32.      At 10:14 a.m., having seen the black shorts and Polo-shirt clad Romanini, Mika took off running toward the water. Romanini says to him non-chalantly, "come on back here when you're done." According to Romanini, Mika "ran behind Calhoun's, down a steep embankment that was covered in brush, and "fell in the river."[5] At 10:14 a.m., Romanini called for a Knoxville Fire Department ("KFD") rescue boat.

_____

[4]Incidentally, Romanini was wearing black shorts and a polo shirt, certainly not a standard police uniform.

[5]Lt. Jeffrey Pappas, who did not arrive until Mika had drowned, reporting the incident to his boss: "Romanini got a call, mentally ill person running around like a maniac down here." At 8:12 on Pappas's body-cam, Pappas says, "Romanini said he 'fell/jumped in the river.'"

-10-

33.     Another citizen video shows Romanini, wearing black shorts and a black Polo short, get out of his cruiser and head toward the water behind Calhoun's. Seconds later, Romanini is seen in another video standing on the bank, near the water, talking to Mika, who is a few feet away, already in the water.

### D.     As Mika Struggles to Keep His Head Above Water, Romanini Encourages Him to Swim and Calls for a Rescue Boat.

34.     Romanini asks Mika, "Why don't you come on out here, dude?" He repeatedly tells Mika to swim. "Swim over to the dock, dude." On the radio, Romanini tells someone that Mika was "attempting to get back to shore but I cannot get to him" – yet, from his own body-cam recording, he never even tried.

35.     By then, several employees and/or patrons of Calhoun's are directly above Mika on the deck or river bank watching him as he struggles in the water. Citizen videos show Mika in the water, his head, chest, and arms above water, struggling to grab hold of tree branches, vines, or shrubs on the river bank above.

36.     At 10:17 a.m., Romanini proclaims to a Calhoun's employee, "I can't get down there. He'll drown my ass!" He tells Mika to "relax buddy," "hang out down there, dude. We got somebody coming with a boat," and at 10:18 a.m., Romanini said, "We'll come get you, if you wait."[6]

_____

[6]A video by a Calhoun's employee shows a bearded KPD officer, wearing black shorts, a black shirt, and a ball cap standing just a few feet above Mika as he tried to keep his head above water, and the officer is telling Mika to "relax."

37.    Around this time, said a Calhoun's employee, Mr. Casey Ridings, for several minutes, one particular officer (Romanini) was on the riverbank "about five feet" from Mika, watching him struggle, and "was not doing anything" to help.

**E.    As Other Officers Arrive, They Fail to Plan or Make Rescue Efforts.**

38.    Officer Joseph Mattina arrives at 10:21 a.m.  Romanini points down and says "see him, right there. He's not going anywhere." Mattina responds, "he's tripping." Romanini says, "I think even if we throw him a rope or something, he's not gonna do it." Romanini repeats his excuse for doing nothing: "I'm not going down there, cause he'll drown my ass." Romanini looked at Mattina and says, "I'm not even joking. He was fucking out of it."

39.    Officer Brandon Brewer arrived next and found Mattina and Romanini on the river bank watching Mika struggle in the water. Brewer's body-cam shows him arrive at the back deck of the restaurant, where two male Calhoun's employees stood watching Mika. Another male employee stood on the ground, also watching. Beyond him were Mattina and Romanini, standing on the bank chatting, a few feet away from Mika, who was feet away from the riverbank. Romanini and Mattini step toward the water's edge, as a nearby Calhoun's employee says, "I think they're waiting on a boat."

40.    Although Mika was just a few feet below the three officers, reaching for bushes, vines, tree limbs, or anything that he could grab, body-cam video shows that Romanini, Mattina, and Brewer acted with no urgency whatsoever throughout the incident to respond to the life-or-death situation. Romanini rejected offers from not one,

-12-

but two Calhoun employees, to help Mika. The officers continued to step near the water's edge, making no attempt to help Mika.

41.     At about 10:22 a.m., Mika gasps and yells out from the water. Mattina radios, "He's stuck in a wooded area in water down a hill."

## F.     Ten Minutes After Mika Fell Into the Water, Officers Warn-Off Would-Be Rescuers and Offer Mika Only Words of Encouragement.

42.     Several Calhoun's employees and customers ran over to where Mika had fallen in and began asking Romanini and then other officers to help him. At least two Calhoun's employees expressed their intent to Romanini, Mattina, and Brewer to go into the water and help Mika, who was increasingly struggling with vines, tree limbs, and a quick current. The officers, most vocally Romanini, warned them not to go into the water to help Mika.

43.     A fourth officer, Officer Timothy Campbell, arrived at the scene at 10:22:16. Like the other officers before him, Campbell tried to vocally coax Mika to get out, yelling "come on, just pull yourself up to the bank," "you got it, come on," and "hey my man, come over here."

44.     With Mika clearly trapped and entangled in vines near the riverbank, Romanini reported that he and other officers (Mattina, Brewer, and Campbell) "attempted to *talk to the victim and help him out of the water*," but Mika (who was fighting for his life at the time), "would not acknowledge us and refused to communicate with anyone on scene."

-13-

45.    At 10:23 a.m., an EMT nears the water's edge, puts gloves on, and gingerly steps a bit closer.

46.    At 10:24 a.m., Mattina, who had been standing with Romanini when Brewer arrived, is standing back from the water looking at his radio. Mattina finally says, "I think we're gonna have to grab him. I don't think he's gonna come out himself." Then, at almost 10:25 a.m., Mattina says, "at least he's above water, which is good." Mattina yells to Mika, "You want some help gettin' out of that water, dude? They gotta rope they can throw ya." Mattina continued to talk to Mika as his head went underwater then came up again, *asking for his name*.

### G.    As Mika Grasps for the Riverbank, Officers Make No Effort to Reach Him With Their Hands, Ropes, a Tow-Strap, Flotation Devices, or a Small Boat.

47.    At 10:25 a.m., on Brewer's body-cam, tree branches or a bush on the riverbank are seen shaking, as Mika tried to grab hold. This video shows how close Mika actually was to the riverbank; yet, none of the four officers tried to reach him with their hands, a baton, a rope, a tow-strap, a flotation device, or anything.

48.    Ridings and Romanini walk around to the dock, where they have a clear view of Mika, who is reaching for brush and/or tree branches. At 10:25:42 a.m., noticing that Mika is being held down by vines tangled around his feet and neck. Ridings says, "that tree's wrapped around his neck."

49.    Then, at 10:26 a.m., Mattina radios and tells dispatch to tell KFD that he doesn't think Mika will be cooperative. Mika gasps loudly at 10:26:36 on Brewer's body-cam video.

-14-

**H.  Mika Goes Under for Good, With the Rescue Boat Still Minutes Away.**

50.     At 10:27 a.m., Mattina yells down to Mika, "hey, hold on to that branch right there, dude," and "come over here, so we can help ya." However, at exactly 10:27:14, Mika's head disappears above water. At 10:27:36, an officer remarks, "yeah, he went under." Mattina says, "lost sight." The paramedic said, "he went under."

51.     Standing on the dock with his arm resting on a pole, Romanini says, "Fuck me. What do we do?" Three minutes later, a KFD rescue boat appears.

52.     At 10:28:41, Officer Campbell climbs down toward the bank and water, holding Ridings' tow-strap, in a belated effort to at least try to reach Mika, who had been underwater for more than a minute by that point. But it's too late. Mika had already drowned.

53.     At 10:30:57 a.m., a KFD Rescue Boat nears the riverbank. Mattina, who had been calling out to Mika, walks closer to the water's edge and pulls back tree branches to get a better look. Mattina pinpoints exactly where Mika had gone under and yells out, "he's high on somethin, for sure."

54.     As the Rescue Boat searches for Mika's body, Mattina tells bystanders, "it ain't too deep," while Romanini says, "guess he just gave up" and "he probably didn't want help *or didn't know that he needed it*." Mattina says "*he's all tangled up down there*. They'll have to get divers."

-15-

**I.    As Mika Struggled and Drowned, Four KPD Officers Watched, Warning Private Rescuers Away and Refusing to Take Any Action to Help Him.**

55.    Witnesses to the incident have stated that the four KPD officers mostly stood on the riverbank, the dock, or the deck for nearly fifteen (15) minutes and watched as Mika struggled to free himself from vines and slowly drowned. By every available witness account, not one of the officers made a serious effort to help Mika.

56.    Witnesses also stated that officers were near boats and at or near Calhoun's dock, where numerous flotation devices and a small boat were stored. Yet, not one officer attempted to use a flotation device or boat to help Mika out of the dangerous water. Instead, the officers devolved into mere bystanders, standing a few feet above Mika on the riverbank, dock, or deck, watching him struggle, just like the Calhoun's employees and patrons, and occasionally urging him on, to "swim" or "get out" or something similar.

57.    Witnesses to the incident further stated that the officers, and particularly Romanini, repeatedly warned Calhoun's employees and patrons who wanted to help Mika from rendering him any aid. At least two would-be citizen-heroes wanted to try to save Mika themselves. One, Ridings, a young Calhoun's employee, pleaded with Romanini to let him throw Mika a twenty-foot tow-strap that Ridings had grabbed from his car trunk. From the moment Ridings brought it up, Romanini balked, telling Ridings it wasn't safe to even try because Mika might try to drown him as well.

58.    An obviously frustrated Ridings said, "should we go over to the dock and try and get him to swim for the dock?" Romanini countered, "I've already told him to,"

-16-

and continued, "the only problem is he's out of his damn mind." But Ridings persisted, telling Romanini he could get keys to a gate underneath Calhoun's where flotation devices or even a small boat were stored, to throw one or more to Mika or at least try to reach him. Romanini replied, "No, he's got to cooperate and that's not going to happen."

59. Another Calhoun's employee, familiar with the riverbank and the surrounding water's depth, came out of the restaurant at about 10:18 a.m., looked down at Mika struggling, and told Romanini emphatically: "we can get there!" Romanini wouldn't even let him try, warning, "If you go down there, he'll pull you in with him."

60. Rescue Divers located Mika's body and pulled him out of the river at approximately 12:40 p.m. His feet and neck were entangled with vines.

61. An autopsy was performed by the Medical Examiner's Office on Mika's body. Not surprisingly, the cause of death was listed as accidental drowning.

## V. WAIVER OF IMMUNITY

62. The City has waived immunity for its own negligence and for its employees, misconduct of officers acting under color of law, and for the negligence of officers, as set out in Tenn. Code Ann. § 29-20-305. There is no immunity for individuals for criminal conduct, or conduct which is willful or malicious.

-17-

## VI. CLAIMS FOR RELIEF

## COUNT ONE

## VIOLATION OF SUBSTANTIVE DUE PROCESS

### Violation of Civil Rights under Color of Law
### 42 U.S.C. §§ 1983 and 1988 under Fourteenth Amendment

**(Against Officers Romanini, Mattina, Brewer, and Campbell, Individually)**

63.     The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim. Specifically, the acts of the four Officers, set forth in detail in Section IV above, Plaintiff's Factual Allegations, are incorporated herein by reference.

64.     The Fourteenth Amendment to the United States Constitution explicitly guarantees to each citizen that no state shall "deprive any person of life, liberty, or property, without due process of law. . . ." U.S. Const., amend. XIV, § 1.

65.     The Fourteenth Amendment also contains a judicially recognized substantive due process component that protects an individual's life, liberty, and property against "certain government actions regardless of the fairness of the procedures used to implement them."

66.     In this instance, Mika Wheeler Clabo was illegally deprived of his life within the meaning of the Fourteenth Amendment. Because Officers Romanini, Mattina, Brewer, and Campbell acted under color of state law to cause this deprivation, they are each liable.

-18-

67.     Federal constitutional duties arise when a governmental body exercises a significant degree of custody or control over an individual and place the person in a worse situation than he would have been had the government not acted at all. Here, such a situation arose by virtue of Officers Romanini, Mattina, Brewer, and Campbell affirmatively placing Mika in an even greater position of danger than he was already in, effectively stripping him off from all potential sources of private aid.

68.     Mika also had a right to affirmative assistance from the four KPD officers, which was likewise clearly established, and the contours of this right were plain enough that each officer could understand that a failure to act on their part amounted to a constitutional violation.

69.     It has always been a fundamental tenet of our constitutional jurisprudence that the state cannot arbitrarily assert its power so as to cut short a person's life. Accordingly, it was clearly established on July 25, 2022, that a citizen in peril for his life had a constitutional right that prevented a police officer from cutting off private avenues of lifesaving rescue without providing an alternative.

70.     A reasonable police officer in the positions of Officers Romanini, Mattina, Brewer, and Campbell should have known that he could not use that authority to prevent private rescue efforts. When they arrived on the scene (first Romanini, then Mattina, then Brewer, and finally, Campbell), there were others present who could have safely attempted a water rescue from the riverbank by hand, rope, tow-strap, flotation device, or even a boat. There was simply no rational reason for the four officers to prefer to wait on a KFD rescue boat that had not yet been launched and

-19-

might not arrive until it was too late. By doing so, not making any rescue efforts themselves, and not allowing others to try, the officers acted recklessly by merely watching a man who they believed to be mentally compromised struggling to free himself from vines, brush, and tree limbs before drowning.

71.     The officers waited nearly fifteen minutes for a rescue squad boat to arrive. It is clear that the officers knew there was a substantial risk of death to Mika, yet consciously chose a course of action that ignored that deathly risk. Such conduct was reckless.

72.     The officers also had a constitutional duty not to act toward Mika in an arbitrary manner. Here, they arbitrarily denied Mika his Fourteenth Amendment right to life.

73.     Specifically, the Officers' violations of Mika's Fourteenth Amendment rights directly and proximately caused Mika to suffer (a) excruciating physical pain and suffering before his death; (b) severe emotional suffering and mental anguish, despair, and hopelessness before his death; (c) lost earnings and/or loss of earning capacity in the future based on the probable duration of his life if his death had not occurred; (d) loss of the enjoyment of the remainder of the probable duration of his life if his death had not occurred; (e) funeral and burial expenses, all of which are recoverable by Plaintiff; and (f) the loss of society and companionship for the Plaintiff, as Mika's parent.

74.     Furthermore, the conduct of Officers Romanini, Mattina, Brewer, and Campbell was also willful, wanton, malicious, deliberately indifferent, and done with

reckless disregard for Mika's federally-protected rights, justifying an award of punitive damages so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct. and therefore warrants the imposition of punitive damages.

75.     Plaintiff sues Officers Romanini, Mattina, Brewer, and Campbell for violating Mika's constitutional rights, and seek any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT TWO

## FAILURE TO TRAIN AND SUPERVISE

### Violation of Civil Rights under Color of Law
### 42 U.S.C. §§ 1983 and 1988 under the Fourteenth Amendment

### (Against the City and Chief Paul Noel)

76.     The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim. Specifically, the acts of the four Officers, set forth in detail in Section IV above, Plaintiff's Factual Allegations, are incorporated herein by reference.

77.     The Due Process Clause prohibits the City and KPD from having any custom, policy, or procedure which would constitute the proximate cause of its officers' deprivation of any citizen's constitutional rights. Where such a custom, policy, or procedure has resulted in its officers' deprivations of a citizen's constitutional rights under 42 U.S.C. §1983, sovereign immunity is removed.

-21-

78. The City and its Officers had a constitutional duty not to act toward its citizens in an arbitrary manner. Here, the City and its Officers arbitrarily denied Mika his Fourteenth Amendment right to life.

79. The City and Chief Noel promulgated policies that led the four KPD officers who responded to the incident to prevent Mika's rescue by private citizens.

80. The City, KPD, and Chief Noel failed to train and supervise officers or employees how to safely and properly respond to drowning incidents or other recurring incidents in which private citizens are imperiled by life-threatening dangers.

81. Specifically, the City, KPD, and Chief Noel have not trained KPD officers that once an officer responds to such an incident and exercises a significant degree of custody or control over an individual and places the person in a worse situation than he would have been had the officer not acted, federal constitutional duties arise.

82. For instance, when Officers Romanini, Mattina, Brewer, and Campbell responded to the incident and discovered Mika in peril of drowning in the river, recognized that he may be mentally compromised, decided not to make any efforts to rescue or help him, and prohibited and/or warned private citizens from doing so, they affirmatively placed Mika in a position of greater danger than he had faced, effectively stripping him of his ability to aid himself, or cutting him off from potential sources of private aid. If he officers had not been present, videos show that private citizens would have attempted to save Mika.

83. By failing to train its officers to recognize that they cannot arbitrarily assert their authority so as to cut short a person's life, the City, KPD, and Chief Noel

-22-

established a policy or custom in violation of the Mika's Fourteenth Amendment right to substantive due process.

84.     Here, the four KPD officers who responded to the incident lacked the tools to safely handle such a perilous situation and, by first not making any reasonable attempt to rescue Mika themselves, and second, prohibiting or warning private citizens from doing so, wound up cutting off any real chance Mika had of surviving the ordeal, causing Mika's death. If they were going to try to rescue Mika before he drowned, certainly warning private citizens not to intercede was reasonable, not arbitrary. But once the officers made the decision to prohibit or warn private citizens from making rescue attempts, not coming up with an alternative to private rescue was arbitrary, and violated Mika's right to substantive due process.

85.     The City is also liable because it had a policy or custom that resulted in Mika's death. The policy required the four officers at the incident scene to prevent private citizens from attempting to rescue another person in danger of drowning.

86.     The policy appears to have required the four officers to prevent any private civilian, not explicitly authorized to do so, from attempting to rescue a person in danger of drowning, and to continue to restrain such rescue efforts until the arrival of authorized rescue personnel, even though the proximate result of such conduct would or could be the serious injury or death of the drowning victim.

87.     Plaintiff does not allege that the City had a policy of refusing to supply rescue services. Rather, the wrong suffered by Plaintiff and Mika is the City's forced imposition of services that Mika did not want or need; the City had a policy of

-23-

arbitrarily cutting off private sources of rescue without providing any alternative, much less a meaningful one.

88.     When the City and its officers greatly increased the risk to Mika by constricting access to self-help, they caused a constitutional injury. By cutting off every source of private aid available to Mika, the City and its officers burdened themselves with a duty to provide replacement protection. By failing to provide such services, especially where the services rendered would not effect a rescue, the City's policy and its officers' actions led to the deprivation of Mika's constitutionally-protected right to life, under § 1983.

89.     The City's policy not only tolerated a risk that someone might drown but actually contemplated that some persons would die for the sake of preventing harm to private rescuers. Protecting the lives of private rescuers rather than the lives of those drowning in the river is an arbitrary choice. While Plaintiff does not suggest that the City desired to see people die in the waters of the Tennessee River, its policy demonstrates a disregard for the value of the lives lost because of its enactment.

90.     Because this policy came from the highest level of decision-makers in the City and KPD, even a single application of the policy – as here – is fairly attributed to the City.

91.     Specifically, these violations of Mika's Fourteenth Amendment rights directly and proximately caused Mika to suffer (a) physical pain and suffering before his death; (b) severe emotional suffering and mental anguish, despair, and hopelessness before his death; (c) lost earnings and/or loss of earning capacity in the

-24-

future based on the probable duration of his life if his death had not occurred; (d) loss of the enjoyment of the remainder of the probable duration of his life if his death had not occurred; (e) funeral and burial expenses, all of which are recoverable by Plaintiff; and (f) the loss of society and companionship for the Plaintiff, as Mika's parent.

92.     Furthermore, the conduct of Officers Romanini, Mattina, Brewer, and Campbell was willful, wanton, malicious, deliberately indifferent, and done with reckless disregard for Mika's federally-protected rights, justifying an award of punitive damages so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct. and therefore warrants the imposition of punitive damages.

93.     Plaintiff sue Officers Romanini, Mattina, Brewer, and Campbell for violating Mika's constitutional rights, and seek any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT THREE

## TENNESSEE GOVERNMENTAL TORT LIABILITY ACT/NEGLIGENCE

### Tenn. Code Ann. § 29-20-101

### (Against Officers Romanini, Mattina, Brewer, and Campbell, Individually)

94.     The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim. Specifically, the acts of the four Officers, set forth in detail in Section IV above, Plaintiff's Factual Allegations, are incorporated herein by reference.

-25-

95.     Officers Romanini, Mattina, Brewer, and Campbell had a duty of care to Mika not to act arbitrarily so as to cause him harm or injury.

96.     The actions of the Officers – refusing to offer any aid to Mika after cutting off and disregarding the efforts of private citizens who sought to do so – were negligent. There were safe alternatives to going into the water. A tow-strap was available, as were ropes, as were flotation devices, and even a small boat. By not allowing such rescue efforts and not engaging in any efforts themselves to help Mika, the four Officers were negligent and that negligence proximately resulted in Mika's unnecessary death by drowning.

97.     The acts of the four Officers proximately caused Mika's death, entitling Plaintiff to recover compensatory damages from the Officers for such damages. Said damages include, but are not limited to, the pain and suffering Mika suffered before his death, lost wages, funeral, and/or related burial expenses, and Plaintiff's loss of Mika's society and companionship.

## COUNT FOUR

## NEGLIGENT OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

### (Against Officers Romanini, Mattina,
### Brewer, and Campbell, Individually)

98.     The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim. Specifically, the acts of the four Officers, set forth in detail in Section IV above, Plaintiff's Factual Allegations, are incorporated herein by reference.

-26-

99. The actions alleged herein against Officers Romanini, Mattina, Brewer, and Campbell – allowing Mika to die by accidental drowning although they were just a few feet away from him and had at their disposal numerous tools, devices, and methods to attempt a rescue and cutting off all other rescue efforts from bystanders – were outrageous and utterly intolerable in a civilized society, and were done with a reckless disregard of the probability of causing emotional distress.

100. From the moment Officers Romanini, Mattina, Brewer, and Campbell encountered Mika, they made Mika's already life-threatening situation even worse by warning off citizens who wanted to try to rescue or help Mika.

101. Officers Romanini, Mattina, Brewer, and Campbell's conduct was perpetrated with reckless disregard of the probability of inflicting mental anguish on Mika.

## COUNT FIVE

## LOSS OF SOCIETY AND CONSORTIUM

### (Plaintiff, Individually, Against all Defendants)

102. The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim. Specifically, the acts of the four Officers, set forth in detail in Section IV above, Plaintiff's Factual Allegations, are incorporated herein by reference.

103. As a direct and proximate result of the Defendants' actions, Plaintiff, individually, and sues for her loss of society and consortium from her son. Plaintiff lost the services, companionship, consortium and society of her son, to which she was

-27-

entitled as his mother; thus, the Defendants are liable to Plaintiff, individually, for the aforesaid losses.

104.    Plaintiff sues for her derivative losses in an amount to be determined as fair and reasonable by a jury at the trial of this matter.

## VII.    JURY DEMAND

105.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

## VIII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

A.      That Defendants be served with a copy of this Complaint and be required to answer;

B.      That the Court find that Defendants have engaged in the conduct and statutory and common law violations alleged herein;

C.      That Plaintiff be awarded such damages as will fully compensate her for all injuries proximately caused by Defendants' actions and that a judgment in her favor be entered;

D.      That Plaintiff be awarded compensatory damages in an amount to be determined by the trier of fact, not to exceed $1,500,000;

E.      That Plaintiff be awarded punitive damages in an amount to be determined by the trier of fact, not to exceed $2,500,000;

F.      That Plaintiff have and recover costs for this suit, including reasonable attorneys' fees and discretionary costs, as provided by law; and

-28-

G.      That Plaintiff be awarded pre-judgment and post-judgment interest as permitted by common law or applicable statute and such other or further relief as may be just and proper.

Respectfully submitted, this 25th day of July, 2023.


/s/ Lance K. Baker
Lance K. Baker
Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
First Horizon Plaza
800 S. Gay Street, Suite 1950
Knoxville, TN 37929
Tel: (865) 200-4117
Email: lance@lbakerlawfirm.com

*Counsel for Plaintiff*

-29-