UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| KIMBERLY WILLIAMS-CLABO, individually and as parent and next of kin to deceased MIKA WHEELER CLABO, <br><br>Plaintiff, <br><br>v. <br><br>CITY OF KNOXVILLE, TENNESSEE, a governmental entity, PAUL NOEL, Chief of Police, individually, WILLIAM ROMANINI, individually, JOSEPH MATTINA, individually, BRANDON BREWER, individually, TIMOTHY CAMPBELL, individually, and JOHN and JANE DOES 1-5, individually, <br><br>Defendants. | No.: 3:23-cv-269-TAV-JEM |

# MEMORANDUM OPINION AND ORDER

Before the Court is defendants Brandon Brewer, Timothy Campbell, Joseph Mattina, and William Romanini's (the "Officer Defendants") motion for summary judgment [Doc. 21]. Plaintiff has responded in opposition [Doc. 65], and the Officer Defendants have replied [Doc. 69]. Accordingly, this matter is now ripe for review. *See* E.D. Tenn. L.R. 7.1(a). For the reasons that follow, the Court **GRANTS** the Officer Defendants' motion for summary judgment [Doc. 21] and this case will be **DISMISSED** as to the Officer Defendants.

I. Background[1]

Plaintiff's claims against the Officer Defendants arise from her son Mika Wheeler Clabo's death by drowning in the Tennessee River on July 25, 2022. Plaintiff asserts four claims against the Officer Defendants: (i) a violation of the decedent's right to substantive due process under the Fourteenth Amendment actionable under 42 U.S.C. § 1983, (ii) negligence, (iii) negligent or reckless infliction of emotional distress, and (iv) loss of filial consortium [Doc. 1].

On July 25, 2022, the Knoxville Police Department ("KPD") received multiple reports of a person "acting erratically in the roadway" [Doc. 65-1, p. 9]. This person, later identified as Clabo, eventually made his way to the bank of the Tennessee River in downtown Knoxville [Doc. 21-1, p. 1]. KPD Officers Romanini and Mattina were dispatched to investigate, though Romanini was the first responding officer to identify and confront Clabo [Doc. 65-1, p. 10]. Bodycam footage depicts Romanini approaching Clabo and asking "whatcha doing," at which time Clabo ran towards, and eventually into, the river [Doc. 65-3, at 10:14:12–40]. The parties dispute whether his entering the water was entirely voluntary [Doc. 22, p. 2] or a result of Romanini's "pursuit" [Doc. 65, p. 4]; however, bodycam footage makes clear that, whatever his motivation, Clabo descended to

---

[1] Because plaintiff is the nonmoving party, the Court describes the facts in the light most favorable to her. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, where video evidence exists, the Court views the facts "in the light depicted by the videos." *Gordon v. Bierenga*, 20 F.4th 1077, 1079 (6th Cir. 2021) (citations and quotations omitted). "If the facts shown on video can be interpreted in multiple ways or if the videos do not show all relevant facts," the Court "views those facts in the light most favorable" to plaintiff. *See id.* (citations omitted) (cleaned up).

the river on his own volition [Doc. 65-3, at 10:14:12–40]. Mattina later stated at deposition that he believed Clabo was under the influence of "alcohol, drugs, mental health, or a combination" [Doc. 65-1, p. 16]. A steep wooded bank abutted Clabo's position in the water, though the parties dispute the accessibility of the water from the bank [*see, e.g.*, Doc. 65-4, p. 14 ("[Y]ou can actually walk down and go straight to it.")].

Seconds later, Romanini called the Knoxville Fire Department ("KFD") to dispatch a rescue boat [Doc. 65-3, at 10:14:30–35]. Romanini later stated that he did not know how long the boat's arrival would take [Doc. 65-2, pp. 23–24]. In the meantime, however, Romanini repeatedly attempted to communicate with Clabo, urging him to swim to a nearby dock where he could be more readily pulled from the water [*Id*. at 100–01]. Over the next several minutes, civilian bystanders from the nearby Calhoun's on the River restaurant ("Calhoun's") [Doc. 65-4, pp. 11–12] and the remaining Officer Defendants arrived and gathered along the riverbank [Doc. 65-1, p. 10; Doc. 65-6, p. 14; Doc. 65-8, p. 12].

Mattina, Brewer, and Campbell similarly attempted to communicate with Clabo, but none undertook an active rescue [*see generally* Doc. 65-3, at 10:14:12–39:29]. Casey Ridings, a kitchen manager at Calhoun's, recalled that the Officer Defendants were "[j]ust standing there, not doing much of anything" [Doc. 65-4, p. 26]. Romanini asked the bystanders if anyone had a rope that could be used to pull Clabo from the water [Doc. 65-3, at 10:20:26–33]. Ridings indicated that he had a tow strap in his car, which he produced a few minutes later [Doc. 65-4, pp. 11–12]. Romanini and Ridings walked onto a boat dock

3

parallel to Clabo's position in the water but did not throw the tow strap towards him because the distance between Clabo and the dock exceeded the length of the tow strap [Doc. 65-3, at 10:24:55–25:30]. Ridings suggested an alternative route underneath Calhoun's that may have provided another recovery point; however, the Officer Defendants declined this alternative [Doc. 65-4, pp. 23–24].

During the 14 minutes in which Clabo struggled in the water [Doc. 65-1, pp. 35–36], the Officer Defendants communicated to each other and to bystanders that attempting to rescue Clabo by entering the water was too dangerous [Doc. 65-3, at 10:21:18–19 ("I'm not going down there, 'cause he'll drown my ass."); Doc. 65-2, p. 91 ("[Y]ou can't go down there or he'll pull your ass in and you'll be done too.")]. Plaintiff contends that these discouragements, made by officers acting "under color of law," amounted to the Officer Defendants thwarting private rescuers from attempting to save Clabo's life [Doc. 65, pp. 4–5]. Each of the Officer Defendants testified that they did not prevent anyone from attempting a rescue [Doc. 21-1, p. 2; Doc. 21-2, p. 2; Doc. 21-3, p. 2; Doc. 21-3, p. 2]. Romanini later testified that he would have only endorsed a qualified water rescuer to attempt a rescue, though his understanding of the requisite qualifications was ambiguous [*see, e.g.*, Doc. 65-2, p. 35 ("They would at least have to able to swim strong.")]. Bodycam footage makes clear that with the exception of Ridings offering a tow strap, no bystander undertook or attempted to undertake a private rescue of Clabo [Doc. 65-3, at 10:14:12–39:29].

The Officer Defendants eventually indicated that Clabo had gone underwater [*Id.* at 10:27:06–14]. The dispatched KFD rescue boat arrived three minutes later, but no signs of life were evident [Doc. 65-10, p. 3]. Clabo's body was later recovered from the river by rescue divers [*Id.* at 3–4].

## II. Standard of Review

Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339 (6th Cir. 1993). Furthermore, all facts and inferences that the Court draws from the record before it must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

Yet, "[o]nce the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

### III. Analysis

#### A. Section 1983 Claims

The Officer Defendants argue that they are entitled to summary judgment on plaintiff's § 1983 claims under the doctrine of qualified immunity [Doc. 22, pp. 7–16]. They first argue that their conduct did not violate plaintiff's substantive due process rights under the Fourteenth Amendment [*Id.* at 7]. They also argue that qualified immunity attaches because they did not violate a "clearly established" right [*Id.* at 2].

Plaintiff responds that the Officer Defendants are not entitled to qualified immunity. [Doc. 65, pp. 12–26]. Plaintiff contends that the Officer Defendants violated Clabo's due process rights by (i) increasing the risk of harm to Clabo and (ii) restricting Clabo's free will to exit the water [*Id.* at 13]. Additionally, plaintiff argues that Clabo's fundamental

6

right to "be free from such 'arbitrary and capricious' governmental actions as occurred in this case" was clearly established law as of the date of the incident [*Id.* at 22].

Where warranted, the doctrine of qualified immunity shields a law enforcement officer, sued in his individual capacity, from suit under § 1983. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Under the familiar test for qualified immunity, a public official is immune from suit unless the plaintiff establishes: (1) a constitutional violation; and (2) that the right at issue was 'clearly established' when the event occurred." *Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021) (citation omitted); *see also Pearson*, 555 U.S. at 231. "If either [prong] is not satisfied, qualified immunity will shield the officer from civil damages." *Gordon*, 20 F.4th at 1082 (citing *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)). *Pearson* also held that "judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 555 U.S. at 236.

1. **Whether Plaintiff's Alleged Rights Were "Clearly Established"**

The parties agree that no reported opinion addresses the precise issues presented by this case [Doc. 65, p. 24; Doc. 22, p. 16]. Much of the parties' "clearly established" arguments center on *Beck v. Haik*, 234 F.3d 1267, 2000 WL 1597942 (6th Cir. 2000) (unpublished table decision) (*Beck I*) and *Beck v. Haik*, 377 F.3d 624 (6th Cir. 2004) (*Beck II*), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009). Specifically, plaintiff argues that (i) *Beck I*, an unpublished opinion, rendered

7

unconstitutional a sufficiently similar set of facts to the instant case and (ii) *Beck II*, a published opinion, adopted, and therefore published by incorporation, *Beck I* and a related Seventh Circuit case, *Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990), putting the Officer Defendants on notice that their actions were unconstitutional [Doc. 65, pp. 20–21]. The Officer Defendants disagree that *Beck II* achieved this precedential result. [Doc. 22, p. 16]. Additionally, they contend that the facts of *Beck I* and *Ross* are readily distinguishable from this case [Doc. 69, p. 8].

For the right at issue to be "clearly established, existing precedent" at the time of the alleged constitutional violation, binding precedent "must have placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 77 (2017)). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). "Specificity is critical; we cannot 'define clearly established law at too high a level of generality.'" *Tarter v. Metro. Nashville Airport Auth.*, No. 22-5421, 2023 WL 5322418, at *5 (6th Cir. Aug. 18, 2023) (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021)). To overcome qualified immunity, a plaintiff must either "identify a case that put [the officer] on notice that his specific conduct was unlawful" or show that this is an "obvious case" where the prevailing standards "'clearly establish' the answer, even without a body of relevant case law." *Brosseau*, 543 U.S. at 198. (citations omitted). In other words, "precedent must be clear enough that every reasonable official would interpret it to establish the particular rule

8

the plaintiff seeks to apply." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Failure to identify "a decision that 'squarely governs' this [case] is particularly detrimental to plaintiff's claim because . . . [q]ualified immunity exists to give public officials breathing room to make close calls when the issue is not black-and-white." *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 488 (6th Cir. 2017) (quoting *Brosseau*, 543 U.S. at 201) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

As a preliminary matter, the Sixth Circuit has already addressed plaintiff's *Beck II* publication argument. Ruling in 2023, over a decade after *Beck II*, the court rejected *Beck I*'s applicability because "[u]npublished cases cannot clearly establish law for purposes of qualified immunity." *Linden v. City of Southfield*, 75 F.4th 597, 605 (6th Cir. 2023) (citing *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022)). Moreover, in holding that *Beck I* was insufficient authority to rebut qualified immunity, the Sixth Circuit explicitly acknowledged *Beck I*'s reliance on *Ross*. *Id.* at 604–05. And *Ross*, standing alone, cannot satisfy plaintiff's burden because it is binding only in the Seventh Circuit. *See Brown v. Giles*, 95 F.4th 436, 442 (6th Cir. 2024) (requiring a "robust consensus" among non-binding authorities for qualified immunity purposes); *Marsh v. Arn*, 937 F.2d 1056, 1069 (6th Cir. 1991) ("[W]hen there is no controlling precedent in the Sixth Circuit our court places little or no value on the opinions of other circuits in determining whether a right is clearly established."), *overruled on other grounds by Farmer v. Brennan*, 511 U.S. 825, 837 (1994), *as recognized by Street v. Corrections Corp. of Am.*, 102 F.3d 810, 815 (6th Cir.1996); *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2001) (ranking "decisions

9

of other circuits" last among precedential authority for qualified immunity purposes). The Court cannot accept plaintiff's recasting of *Beck I*'s procedural history in light of the Sixth Circuit's directive in *Linden*.[2]

Even if *Beck I* and *Ross* were deemed established authority for qualified immunity purposes, both cases are distinguishable from the facts of this case. In *Beck I*, local officials actively forbade, by police order, a qualified, private dive team from attempting to rescue a man who eventually drowned. 2000 WL 1597942, at *1–2. The Sixth Circuit reversed the district court's grant of summary judgment as to the county and city, holding that "there are genuine issues of material fact as to whether the county cost [plaintiff] his life by its supposedly arbitrary policy against private rescue efforts." *Id*. at *4–5. In *Ross*, a local sheriff barred two lifeguards, two fire fighters, one police officer, and two civilian scuba-divers from attempting a rescue. 910 F.2d at 1424. The Seventh Circuit reversed the district court's grant of summary judgment to a police officer because he "should have known that he could not use that authority to prevent private rescue efforts." *Id.* at 1433.

In the instant case, the Officer Defendants may have discouraged bystanders of unknown training, none of whom attempted or offered to attempt a water rescue, from entering the river. Unlike *Beck I* and *Ross*, no private dive team, lifeguards, firefighters,

---

[2] Plaintiff argues in a footnote that, contrary to the Officer Defendants' arguments [Doc. 22, p. 16], *Linden* cited *Beck II* and "f[ound the] case readily distinguishable from *Beck I*" [Doc. 65, p. 25 n.11]. The Court finds only one citation to *Beck II* in *Linden*: a quotation included in a string cite to support the general proposition that a state-created exception exists to the *DeShaney* rule. *Linden*, 75 F.4th at 602. Nowhere in the opinion does the Sixth Circuit directly distinguish *Beck I* and *Beck II*. More importantly, the Circuit court's holding with respect to *Beck I*'s inapplicability was clearly issued with full awareness of both cases.

Case 3:23-cv-00269-TAV-JEM   Document 72   Filed 09/23/24   Page 10 of 15   PageID #: 917

or other "on-duty rescue personnel," *Ross*, 910 F.2d at 1433, were present until the arrival of the KFD rescue boat [*see generally* Doc. 65-3, at 10:14:12–39:29]. The Sixth Circuit has held that the absence of a "qualified private rescuer" alone has distinguished *Beck I* in many cases, leading to "no constitutional violation." *Linden*, 75 F.4th 597, 605 (6th Cir. 2023) (citing *Willis v. Charter Twp. of Emmett*, 360 F. App'x 596 (6th Cir. 2010); *Tanner v. Cnty. of Lenawee*, 452 F.3d 472, 481 (6th Cir. 2006); *Pierce v. Springfield Township*, 562 F. App'x 431, 439 (6th Cir. 2014); *Hermann v. Cook*, 114 F. App'x 162, 166 (6th Cir. 2004)). In other words, even if the Court accepts plaintiff's contention that the Officer Defendants' comments dissuaded untrained bystanders from attempting a rescue [*see* Doc. 65, pp. 4–5], this case remains distinguishable from the conduct at issue in *Beck I* and *Ross* where officers blocked qualified rescuers. Regardless of the precision with which the Officer Defendants evaluated a would-be rescuer's qualifications [*see* Doc. 65-2, p. 35], no bystander on the scene expressed a willingness to rescue Clabo—much less a professional background or training in water-based rescue.

Further contrasting with the reopened municipal liability claims in *Beck I*, plaintiff does not allege that the Officer Defendants acted pursuant to an official policy prohibiting private rescue [*see* Doc. 1]. Moreover, since *Beck I* and *Ross* focused on police directives to non-police rescuers, they neither address nor impose a constitutional duty regarding the Officer Defendants' personal rescue efforts, including their decision not to explore an alternative recovery point [Doc. 65-4, pp. 23–24]. In sum, plaintiff's invocation of *Beck I*, *Beck II*, and *Ross* cannot show "that it is 'beyond debate' that the principle *Beck* relied

11

upon extends to circumstances like those of this case." *Linden*, 75 F.4th at 605 (quoting *al-Kidd*, 563 U.S. at 741).

Plaintiff's remaining citations similarly fail to demonstrate "clearly established" law that would place the Officer Defendants on notice that their conduct was unconstitutional. Her citation to *Jackson v. Schultz*, 429 F.3d 586 (6th Cir. 2005) cuts *against* her position: the Sixth Circuit there held that plaintiff failed to allege a "clearly established" constitutional violation, emphasizing again the lack of evidence that "any private rescue was available or attempted." In *Jackson*, plaintiff alleged that an emergency medical technician violated the decedent's due process rights by placing him inside an ambulance without administering medical care. *Id*. at 588. Whereas the district court had held that the technicians were not entitled to qualified immunity, the Sixth Circuit reversed, finding insufficient evidence of a constitutional violation. *Id.* at 592.

Plaintiff has failed to satisfy her burden of citing binding precedent that "placed the statutory or constitutional question beyond debate." *Rivas-Villegas*, 595 U.S. at 5. Where "either [prong] is not satisfied, qualified immunity will shield the officer from civil damages." *Gordon*, 20 F.4th at 1082. Therefore, the Officer Defendants are entitled to qualified immunity because no "clearly established" precedent existed on the date in question sufficient to alert them to the alleged unconstitutionality of their actions.

Because the Court concludes that no "clearly established" law put the Officer Defendants on notice that their conduct was unconstitutional, it is unnecessary to reach the merits of the parties' substantive due process arguments for purposes of ruling on the

12

motion for summary judgment. *See Pearson*, 555 U.S. at 236 (holding that district courts may address either prong of qualified immunity first). Indeed, where one qualified immunity prong is dispositive, opining on the other prong would "depart[] from the general rule of constitutional avoidance." *Id.* at 241.

Accordingly, their motion for summary judgment as to the federal claims is **GRANTED**.

### B. Tennessee Tort Claims

The Officer Defendants also argue that the defense of qualified immunity applies to plaintiff's state tort claims [Doc. 22, p. 21 n.5; Doc. 69, pp. 13–14]. Plaintiff contends that the Officer Defendants waived their Tennessee qualified immunity defense by initially raising it in a single footnote [Doc. 65, p. 30 n.14].[3] Additionally, plaintiff cites *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008) and *Biscan v. Brown*, 160 S.W.3d 462, 480 (Tenn. 2005) to develop her claim that state tort law imposed a legal duty upon the Officer Defendants under these circumstances [Doc. 65, p. 28].

Tennessee courts recognize a state law qualified immunity defense "to state tort actions against government officers for their discretionary functions." *Hammond-Beville v. Landis*, No. 21-5498, 2022 WL 910569, at *5 (6th Cir. Mar. 29, 2022) (citing *Youngblood v. Clepper*, 856 S.W.2d 405, 405 (Tenn. Ct. App. 1993)). Although the Tennessee Supreme Court has yet to clarify the precise contours of this immunity doctrine, the Sixth Circuit, this Court, and Tennessee Courts of Appeals have held that the state's

---

[3] The Officer Defendants elaborated on this defense in their reply [*see* Doc. 69, pp. 13–14].

13

qualified immunity analysis parallels that of the federal common law. *Hammond-Beville*, 2022 WL 910569, at *5 ("[T]his defense is highly analogous to the qualified-immunity defense the U.S. Supreme Court has recognized for state officers sued under 42 U.S.C. § 1983."); *Willis v. Neal*, No. 1:04-CV-305, 2006 WL 1129388, at *2 (E.D. Tenn. Apr. 24, 2006), *aff'd*, 247 F. App'x 738 (6th Cir. 2007) ("The analysis of qualified immunity under § 1983 and Tennessee state law is coextensive."); *Youngblood*, 856 S.W.2d at 405 (granting "qualified immunity . . . to state officers performing discretionary functions"). Specifically, the state qualified immunity defense turns on "whether defendants committed a clearly established state tort violation." *Hammond-Beville*, 2022 WL 910569, at *5.

As with plaintiff's citations to federal law (*see supra* Section III(A)(1)), her citations to *Satterfield* and *Biscan* are not "clear enough that every reasonable official would interpret [them] to establish the particular rule the plaintiff seeks to apply." *Wesby*, 583 U.S. at 63. *Satterfield* addressed the duty of care between a private company and its employees with respect to asbestos exposure. 266 S.W.3d at 351–52. *Biscan* analyzed whether an adult hosting a party owes a duty of care to minor guests. 160 S.W.3d at 466. Neither case "clearly established" law regarding duties owed by police officers or the more general duty of care owed to a drowning person. Indeed, the only tangentially related precedent located by the Court does little to bolster plaintiff's position. *See Russell v. City of Chattanooga*, 279 S.W.2d 270 (1954) (withholding municipal tort liability where city trenches led to two minors' death by drowning); *Cooper v. Rutherford Cnty.*, 531 S.W.2d 783, 783 (Tenn. 1975) (immunizing county from tort liability where road design led to

14

motorist's death by drowning); *cf. City of Newport v. Ford*, 393 S.W.2d 760, 763 (1965) (affirming municipal tort liability where murky water and lifeguard inattentiveness led to death by drowning in city-owned pool). In the absence of state tort precedent applicable to "the specific context of the case," *Brosseau*, 543 U.S. at 198, the Officer Defendants could not have been put on notice that their actions violated "clearly established" state tort law. *See Gordon*, 20 F.4th at 1082.

Accordingly, their motion for summary judgment as to the remaining state claims is **GRANTED**.

IV. **CONCLUSION**

Accordingly, the Court **GRANTS** the Officer Defendants' motion for summary judgment [Doc. 21] and all claims against the Officer Defendants are **DISMISSED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan  
UNITED STATES DISTRICT JUDGE